# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3833

_____

Southwestern Bell Telephone     *
Company,     *
    *
          Appellant,     *
    *
       v.     *
    *
Missouri Public Service Commission;     *
Sheila A. Lumpe; M. Dianne Drainer,     *    Appeals from the United States
Vice-Chair; Harold Crumpton,     *    District Court for the
Commissioner; Robert Schemenauer,     *    Western District of Missouri.
Commissioner; Connie Murray,     *
Commissioner, all the above parties in     *
their official capacities as     *
commissioners of the Missouri     *
Public Service Commission; AT&T     *
Communications of the Southwest,     *
Inc.,     *
    *
          Appellees.     *

_____

No. 99-3908

_____

Southwestern Bell Telephone     *
Company,     *
    *
          Appellant,     *
    *

v.                                           *
                                             *
Missouri Public Service                      *
Commission; Sheila A. Lumpe;                 *
M. Dianne Drainer, Vice-Chair;               *
Harold Crumpton, Commissioner;               *
Connie Murray, Commissioner, all the         *
above parties in their official              *
capacities as commissioners of the           *
Missouri Public Service Commission;          *
AT&T Communications of the                   *
Southwest, Inc.,                             *
                                             *
        Appellees.                           *

_____

Submitted:  May 8, 2000
    Filed:  January 8, 2001
_____

Before RICHARD S. ARNOLD and BOWMAN, Circuit Judges, and MAGNUSON,[1]
    District Judge.

_____

BOWMAN, Circuit Judge.

Southwestern Bell Telephone Co. (SWBT) appeals from the order of the District Court affirming in part and remanding in part orders of the Missouri Public Service Commission (PSC). In light of recent developments in the law, we remand to the District Court with instructions.

_____

[1]The Honorable Paul A. Magnuson, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

# I.

This case arises under the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified in scattered sections of 47 U.S.C.),[2] which was enacted to increase competition in the provision of telecommunications services. Under the Act, an incumbent local exchange carrier (LEC)[3] is obligated "to share its network with competitors." AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999) (citing 47 U.S.C. § 251(c) (Supp. II 1994)). The prospective competitor and the incumbent LEC "may negotiate and enter into a binding agreement . . . without regard to the" obligations imposed by certain sections of the Act. 47 U.S.C. § 252(a)(1). For example, the parties may agree to rates or terms that would not otherwise comply with the law or be required under the Act, as long as the state commission ultimately approves. "But if private negotiation fails, either party can petition the state commission that regulates local phone service to arbitrate open issues, which arbitration is subject to § 251 and the FCC regulations promulgated thereunder." AT&T Corp., 525 U.S. at 373.

Here, AT&T sought access to incumbent LEC SWBT's network for the purpose of providing local telephone service in Missouri, and the parties entered into negotiations. Unable to reach agreement on all of the terms and conditions, AT&T sought PSC arbitration as provided for in 47 U.S.C. § 252(b). There were two arbitrations, the second of which was preceded by a mediation conducted by the PSC's

---

[2]Unless otherwise indicated, all references in this opinion to sections and subsections of the Telecommunications Act of 1996 are to Supp. IV (1998) of the United States Code. All references to the Code of Federal Regulations (C.F.R.) are to the most recent available version, the 1999 edition.

[3]LECs provide local telephone service or offer local access for long-distance service. 47 U.S.C. § 153(16), (26), (47). Incumbent LECs are those that were providing local phone service to an area on the effective date of the Act. Id. § 251(h)(1).

general counsel acting as a special master. The PSC approved a final agreement on March 19, 1998.

SWBT sought review in the District Court. See 47 U.S.C. § 252(e)(6) (conferring federal court jurisdiction for aggrieved party to challenge state commission determination as violation of Act). The court affirmed in part and reversed and remanded in part. AT&T Communications of the Southwest, Inc. v. Southwestern Bell Tel. Co., 86 F. Supp. 2d 932 (W.D. Mo. 1999) (consolidated cases). SWBT appeals to this Court, challenging (1) the process employed by the PSC, (2) two of the PSC's pricing decisions, and (3) a PSC decision regarding combined network elements. We address the pricing decisions first.

II.

After the passage of the Telecommunications Act of 1996, the Federal Communications Commission (FCC), as charged by Congress in the Act, promulgated rules to implement the part of the Act at issue in this case. See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15499 (1996) (First Report and Order). The PSC's pricing decision that is challenged here was made by reference to the FCC's chosen method of cost-based pricing. The FCC's method is known by its acronym, TELRIC, which stands for total element long run incremental cost. TELRIC provides a basis for determining the prices that will be charged for the interconnection and network elements that incumbent LECs are required to make available to potential competitors. In its First Report and Order, the FCC adopted TELRIC as a "forward-looking, cost-based pricing standard." Id. at 15844, ¶ 673. As described in 47 C.F.R. § 51.505(b)(1), the FCC determined that the TELRIC of an element (and therefore the price an incumbent LEC may charge a potential competitor for that element) "should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire

-4-

centers."  After reviewing a direct challenge to § 51.505(b)(1), however, this Court recently vacated the FCC's pricing methodology:

> At bottom . . . , Congress has made it clear that it is the cost of providing the actual facilities and equipment that will be used by the competitor (and not some state of the art presently available technology ideally configured but neither deployed by the ILEC nor to be used by the competitor) which must be ascertained and determined.

Iowa Utils. Bd. v. FCC, 219 F.3d 744, 751 (8th Cir. 2000) (Iowa Utils. II).[4]

Here, it is clear that price—the amount that may be charged for the network access AT&T seeks from SWBT—is the overarching focus of the § 252 agreement between the parties, and we do not believe that the pricing decisions therein are severable from the rest of the agreement.  We therefore conclude that the holding in Iowa Utilities II invalidating the TELRIC pricing methodology requires that the entire arbitrated agreement approved by the PSC in this case be vacated and that further

---

[4]Legal challenges to the rules promulgated in the FCC's First Report and Order, and they are legion, have been consolidated in the Eighth Circuit.  Iowa Utils. Bd. v. FCC, 120 F.3d 753, 792 (8th Cir. 1997) (Iowa Utils. I).  Our decision last summer  in Iowa Utilities II resulted from the Supreme Court's remand of our decision in Iowa Utilities I.  See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366 (1999).  The Supreme Court in AT&T Corp. specifically noted that it was not addressing the TELRIC methodology question (subsequently decided by the Eighth Circuit in Iowa Utilities II). Id. at 374 n.3.

We also should note that, after the opinion in Iowa Utilities II was filed on July 18, 2000, the panel granted the FCC's motion to stay the mandate on that part of the decision that vacated 47 C.F.R. § 51.505(b)(1), pending the filing and disposition of petitions for writ of certiorari in the Supreme Court.  In October 2000, a number of such petitions were filed, and as this opinion is written those petitions remain pending in the Supreme Court.  Notwithstanding this turn of events, our decision in Iowa Utilities II is not vacated, remains the law, and requires vacatur of the § 252 agreement reached in this case.

proceedings (assuming AT&T still wants access to SWBT's network in Missouri) be held. Any such proceedings should employ a pricing methodology that is consistent with the 1996 Act as interpreted by this Court.

SWBT further argues that, "[e]ven if it were permissible to set prices based on the forward-looking costs of an idealized network, the PSC arbitrarily reduced Southwestern Bell's NRCs [nonrecurring costs] for unbundled network elements to a level below even those contemplated by a super-efficient hypothetical network." Br. of Appellant at 56. Because we hold, in keeping with this Court's decision in Iowa Utilities II, that it was not permissible for the PSC "to set prices based on the forward-looking costs of an idealized network," and because we are remanding for further proceedings that will involve new calculations, we do not address the nonrecurring costs issue SWBT raises.

### III.

Given that this case was not the proper vehicle for a collateral challenge to the FCC's rulemaking (that is, to the TELRIC methodology per se), but instead presented only a challenge to the PSC's application of FCC rules to the facts of the case, the TELRIC pricing issue on which we decide the case merited only fleeting mention in the briefs, and appropriately so. The bulk of SWBT's argument for remand was dedicated to challenging the process afforded SWBT (and AT&T, for that matter) during the proceedings before the PSC. As we have said, the pricing methodology employed by the PSC in this case pursuant to rules promulgated by the FCC is not valid under the Act, and thus the § 252 agreement must be vacated. On remand, negotiations between the parties, and PSC arbitration as necessary, will begin anew, and so the process afforded SWBT in the initial PSC proceeding is now of no consequence. Accordingly, we decline to address the constitutional due process arguments raised by SWBT. Without deciding the question, however, we nevertheless note that there appear to be at least potential due process problems inherent in the procedure employed by the

PSC.[5]  In any future § 252 arbitrations that become necessary in this case, or in any other such case that may come before the PSC, we caution the PSC to be more circumspect in the process it employs, with particular attention to excessive reliance on staff reports, especially those reports compiled after unnecessary ex parte discussions with parties.  If the PSC fails to do so, the next aggrieved party to appear in federal court on a matter such as this may well be able to demonstrate that the procedures employed (which, incidently, were vehemently objected to by AT&T as well as SWBT at the time of the arbitrations) either were inherently lacking in due process or resulted in prejudice to the aggrieved party, requiring vacatur of the results of the proceedings.

IV.

Finally, SWBT complains that its agreement with a particular negotiated provision, an agreement made only to comply with an FCC rule later determined to be invalid under the Act, did not constitute a waiver of its right to challenge the negotiated provision in federal court.  Both the PSC and the District Court determined that the agreement was voluntary and enforceable.

In Iowa Utilities I, this Court vacated 47 C.F.R. § 51.315(c)-(f).  120 F.3d at 813.  Those subsections required incumbent LECs to combine network elements as requested by a potential competitor and as technically feasible "in any manner, even if those elements are not ordinarily combined in the incumbent LEC's network."  47

---

[5]The District Court found that SWBT was not prejudiced by the alleged irregularities (which are fully set forth in that court's opinion) and therefore declined to invalidate the PSC proceedings and the results of those proceedings.  AT&T Communications, 86 F. Supp. 2d at 951-55.  The court also concluded that the PSC procedures were neither arbitrary and capricious, nor in violation of any state statutes or regulations that might be applicable to state commission arbitrations held pursuant to 47 U.S.C. § 252.  Id. at 955-58.

C.F.R. § 51.315(c). The Supreme Court in AT&T Corp. did not disturb our holding that the rules must be vacated, and we reaffirmed our conclusion in Iowa Utilities II. 219 F.3d at 759 ("We are convinced that rules 51.315(c)-(f) must remain vacated.").

Our opinion in Iowa Utilities I was filed on July 18, 1997, at which time all were on notice that the combination rules of 47 C.F.R. § 51.315(c)-(f) were contrary to the Act. By the end of the month, the PSC issued its final arbitration order in this case.[6] On August 20, 1997, SWBT filed a Motion for Clarification, Modification and Application for Rehearing of Final Arbitration Order. That motion cited Iowa Utilities I, but not in reference to the vacatur of § 51.315(c)-(f). On October 10, 1997, nearly two months later, the parties filed an interconnection agreement (we use the term loosely, as such agreement incorporated the PSC's arbitration orders) for PSC approval. According to the terms of the agreement, SWBT was to provide combinations of network elements as requested by AT&T whether or not such elements were combined in SWBT's existing network, notwithstanding that this Court had invalidated the FCC's rules so requiring almost three months earlier. SWBT filed a Notice of Clarification Concerning Pending Interconnection Agreement on October 30, 1997, and for the first time advised the PSC of the Iowa Utilities I decision regarding the rules set forth in § 51.315(c)-(f). The PSC approved the October 10 interconnection agreement on November 5, 1997, and later rejected the § 51.315(c)-(f) argument presented in SWBT's Notice of Clarification. The District Court, in its review, concluded that SWBT voluntarily agreed to combine unbundled elements *after* we had vacated the FCC's rules requiring incumbent LECs to do so and therefore the PSC "properly required SWBT to abide by its contractual agreement." AT&T Communications, 86 F. Supp. 2d at 958.

---

[6]According to SWBT, the determination that SWBT would combine network elements for AT&T was resolved in the voluntary negotiations that took place before arbitration. Br. of Appellant at 61 ("The negotiations preceding the arbitration were conducted under the FCC mandate to combine elements, and the only matters presented for arbitration involved the prices at which the network elements would be offered.").

SWBT now claims that the § 51.315(c)-(f) rules remained binding throughout the arbitration process, so "Southwestern Bell was legally required to offer network element combinations." Br. of Appellant at 61 (emphasis omitted). Therefore, phrasing the issue in terms of waiver, SWBT asserts there was no voluntary and intentional relinquishment of a known right but merely acquiescence in the law. According to SWBT, "the PSC consistently required Southwestern Bell to comply with unlawful combination provisions." Id. at 65.[7]

Although the timing of the relevant decisions, agreements, and motions points to the conclusion that SWBT voluntarily agreed to combine unbundled network elements for AT&T, even though the law did not so require when SWBT executed the agreement, this is another question we need not reach.[8] As we have said, the October

_____

[7]As we have said, under the Act an agreement that is entered into "without regard" to the obligations as set forth in 47 U.S.C. § 251(b) and (c) nevertheless will be enforceable (if approved by the state commission) if it is the product of voluntary negotiations. 47 U.S.C. § 252(a)(1). In other words, if SWBT *voluntarily* (knowledge of the law assumed) agreed to take an action that was not an "obligation" under the Act, there would be no grounds for vacating the agreement as a violation of the Act. Although combining unbundled network elements is not now required by law, it is not forbidden by law.

[8]Substantially similar cases go both ways on this question (and none is binding authority in this Circuit in any event.) Compare US W. Communications , Inc. v. Hix, 93 F. Supp. 2d 1115, 1126 (D. Colo. 2000) (finding jurisdiction to review claim where party raised issue with state commission as soon as Iowa Utilities I was decided, "[i]n other words . . . as soon as practicable after the law substantially changed on this issue") and MCI Telecomms. Corp. v. US W. Communications Inc., No. C97-1508R, 1998 U.S. Dist. LEXIS 21585, at *8 (W.D. Wash. July 21, 1998) (concluding no waiver because arbitrator applied regulation that had been "repudiated"), aff'd in part, rev'd and remanded in part on other grounds, 204 F.3d 1262 (9th Cir.), cert. denied, 121 S. Ct. 504 (2000) and AT&T Communications of the S. States, Inc. v. BellSouth Telecomms., Inc., 7 F. Supp. 2d 661, 670 (E.D.N.C. 1998) (striking paragraph in agreement where, "[a]t the time of the Agreement, BellSouth was merely adhering to

10, 1997, agreement between SWBT and AT&T must be vacated, and there will be new negotiations or arbitrations (as necessary) under a revamped pricing standard, presumably leading to a totally new agreement. Therefore the issue of whether SWBT voluntarily agreed to combine unbundled network elements in the October 10 agreement, when the law did not so require, is moot.

## V.

To sum up, we reverse the District Court on the question of TELRIC pricing and remand with instructions to remand to the PSC for further proceedings not inconsistent with this opinion. The network sharing agreement of October 10, 1997, between SWBT and AT&T is vacated. Any new agreement reached with the aid of arbitration by the PSC shall be the result of proceedings that are not offensive to the requirements of procedural due process and shall employ a pricing methodology that is consistent with the Act. The procedural due process challenge raised here is moot and therefore we do not decide the issue. We likewise hold that any question regarding the validity of SWBT's agreement to combine network elements not combined in its own system is moot, inasmuch as the agreement is vacated and will now be subject to renegotiations. Thus, we do not address that question either.

---

established FCC rules that § 251(c)(3) compels an ILEC to combine purchased network elements"), remanded, 229 F.3d 457 (4th Cir. 2000) (agreeing challenge to agreement was cognizable but remanding for review by district court in first instance of paragraph at issue on the merits in light of changes in law); with U S W. Communications, Inc. v. Worldcom Techs., Inc., 31 F. Supp. 2d 819, 826 (D. Or. 1998) (finding no waiver of challenge to agreement to recombine unbundled elements without discussing fact that agreement was executed more than a month after Iowa Utilities I was filed).

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.